IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| G.K., by and through his parents, C.B. and T.K., and C.B. and T.K., in their own right<br>*Plaintiffs* | : : : : : | CIVIL ACTION<br><br>NO. 13-4538 |
| v. | : : : | |
| THE MONTGOMERY COUNTY INTERMEDIATE UNIT<br>*Defendant* | : : : : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                  JULY 17, 2015

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff, G.K., is a preschool student with a disability who is eligible to receive special education services. G.K.'s parents, C.B. and T.K. ("Parents"), individually and on behalf of G.K. (collectively, "Plaintiffs"), filed this federal action against the Montgomery County Intermediate Unit ("Defendant" or the "IU"), pursuant to the *Individuals with Disabilities Education Improvement Act* ("IDEIA"),[1] 20 U.S.C. §1400 *et seq.*, and §504 of the Rehabilitation Act of 1973, 29 U.S.C. §729, ("§504" and/or "RA"), challenging the decision of a Pennsylvania Special Education Hearing Officer ("Hearing Officer"), who (1) found that Defendant provided G.K. a *Free Appropriate Public Education* ("FAPE"), and (2) denied, in part, Plaintiffs' claim for reimbursement of costs for services made or for which payment is pending, which were spent to ensure that G.K. received an appropriate education. In the complaint, Defendant is identified as a public educational agency established pursuant to the Pennsylvania School Code, 24 P.S. §2-201

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended and renamed to the IDEIA, effective July 1, 2005. *See* Pub. L. No. 108-446, 118 Stat. 2715 (2004). This Court will refer to this Act as the IDEIA throughout this Memorandum Opinion.

*et seq.*, and the *Local Educational Agency* ("LEA"), as defined by the IDEIA, responsible for providing G.K. with a FAPE.

Before this Court are the parties' cross-motions for summary judgment or for judgment on the administrative record, [ECF 19, 20], and the respective responses. [ECF 22, 23]. The issues have been fully briefed and the motions are ripe for disposition. For the reasons stated herein, the decision of the Hearing Officer is affirmed. Consequently, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment is denied, *in part.*

**BACKGROUND**

In their motion for summary judgment, Plaintiffs seek (1) a reversal of the Hearing Officer's decision, (2) a finding of entitlement to compensatory education, and (3) a declaration that they are the prevailing parties and are, therefore, entitled to recover reasonable attorneys' fees and costs. In its motion, Defendant disputes the Hearing Officer's decision to reimburse Plaintiffs the costs they incurred to provide certain services to G.K. and, otherwise, seeks the affirmance of the Hearing Officer's decision in all other respects.

To address the issues raised in the parties' cross-motions, a procedural and factual summary of this case is appropriate. Briefly, the procedural history is as follows:

*Administrative Proceedings*

On December 17, 2012, a due process hearing was convened before a Hearing Officer. The hearing concluded on March 26, 2013, after eight sessions and the parties' submission of written closing arguments. Generally, the issues at the hearing were (1) whether Defendant offered and provided *Early Intervention* ("EI") services that were appropriate for G.K. in accordance with G.K.'s *Individualized Education Program* ("IEP"), and identified needs, and (2) whether Parents were entitled to reimbursement for the expenses they incurred for a service provider they selected to replace the services that Defendant did not provide, either because Parents rejected the services or because the providers withdrew from providing services. The dispute between the parties involves the period from June 2012 through February 2013.

On May 8, 2013, the Hearing Officer rendered a decision which found that: (1) the issues were caused primarily by Parents' efforts to control the type of services G.K. received and the details of their implementation; (2) Defendant took all reasonable steps to provide appropriate *Applied Behavior Analysis* ("ABA") therapy and behavior support services; (3) Parents cannot force Defendant to accept their choice of a service provider, either directly or indirectly; and (4) G.K. made progress towards G.K.'s IEP/*Individual Family Service Plan* ("IFSP") goals.[2] The Hearing Officer concluded that to the extent Defendant had not paid for service hours specified in G.K.'s IEP/IFSP due to the absence of an IU provider, Defendant was required to reimburse Parents for those hours only. Thus, Parents' claim for the full reimbursement of expenses incurred to provide services to G.K. was denied, in part.

*District Court Action*

On August 6, 2013, Plaintiffs timely filed a complaint in this Court against Defendant, challenging the administrative decision and arguing that the Hearing Officer (1) applied an erroneous legal standard pertinent to the Parents' right to participate in the development of G.K.'s IEP and to advocate for G.K. once the IEP was implemented, (2) found facts not supported by a preponderance of the evidence and, therefore, the legal conclusions reached were without basis in fact, and (3) erred in concluding that the Parents waived their claim for compensatory education. Plaintiffs further assert entitlement to relief under §504 of the RA, and seek reimbursement for services provided by the *Lovaas Institute* ("Lovaas") for services it provided (a) in August 2012, (b) from October 2012 until February 2013, and (3) for purportedly deficient IU services provided.

On October 2, 2013, Defendant filed a motion to dismiss Plaintiffs' §504 claim under the RA arguing that Plaintiffs could not establish that G.K. was discriminated against because of a disability. [ECF 7]. This motion was denied on December 10, 2013. [ECF 12]. On January 14, 2014, Defendant filed an answer, denying Plaintiffs' averments, and asserting numerous defenses and a counterclaim in the nature of an appeal of the Hearing Officer's decision. [ECF 15]. On April 30, 2014, and May 5, 2014, the parties filed the instant cross-motions.

**LEGAL STANDARD**

To dispose of the cross-motions for summary judgment, it is important to briefly discuss the legal standards involved and the applicable pertinent statutes.

---

[2] A child's IFSP, provided for those eligible for services under three years of age, is a written document developed by a multidisciplinary team, including the child's parents, which states the child's levels of development, the family's resources, priorities, and concerns, and the major outcomes expected to be achieved for the child and the family. 20 U.S.C. §1436(d).

3

*The Individuals with Disabilities Education Improvement Act Statutory Framework*

The predecessor statute to the IDEIA, the *Education of the Handicapped Act* ("EHA"), 20 U.S.C. §§1401-1462, was enacted in response to a congressional finding that a majority of children with disabilities did not receive appropriate educational services. *Lebron v. N. Penn Sch. Dist.*, 769 F. Supp. 2d 788, 791 (E.D. Pa. 2011) (citing *Oberti v. Bd. of Educ. of the Bor. of the Clementon Sch. Dist.*, 995 F.2d 1204, 1213 (3d Cir. 1993)); *see also* 20 U.S.C. §1400(c)(2). The EHA was amended in 1990. Today, the IDEIA authorizes federal grants to states on the condition that the states provide appropriate education to children with disabilities in accordance with the Act. 20 U.S.C. §1411. For eligible children under the age of three, the IDEIA requires that the state must provide *Early Intervention* ("EI") services that "are designed to meet the developmental needs of an infant or toddler." 20 U.S.C. §1432(4)(C). EI services must be provided in conformity with the child's *Individualized Family Service Plan* ("IFSP"). §1432(4)(H).

Once an eligible child is three years of age (and under age 21), states receiving federal education funding are required to provide every disabled child with a FAPE, which "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268-69 (3d Cir. 2012) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188-89 (1982)), as well as "significant learning" and "meaningful benefit" to the child. *Id.* at 269 (citing *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010)); *J.E. v. Boyertown Area Sch. District*, 834 F. Supp. 2d 240, 253 (E.D. Pa. 2011); *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 247 (3d Cir. 1999). "[T]he provision of merely more than a trivial educational benefit" is

insufficient. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (internal marks and citations omitted).

The core of the IDEIA is the collaborative process that it establishes between parents and schools culminating in the *Individualized Educational Program* ("IEP"), *M.R.*, 680 F.3d at 269 (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005)), which is the "central vehicle" for this collaboration, *Schaffer*, 546 U.S. at 53, and the "primary mechanism" for delivering a FAPE. *M.R.*, 680 F.3d at 269; *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds*, *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) (*en banc*). However, the IEP does not have to provide "the optimal level of services," *D.S.*, 602 F.3d at 557, or "*incorporate every program requested by the child's parents.*" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 268 (quoting *M.R.*, 680 F.3d at 276); *see also Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989) (explaining that the IDEIA guarantees to a disabled child "an education that is appropriate, not one that provides everything that might be thought desirable by loving parents" (internal marks and citations omitted)). Neither does a plaintiff have a right to compel a school district to provide a specific program even if it is the best possible education for their child, as the district is not required to "maximize educational benefits." *See Rowley*, 458 U.S. at 197 n.21, 199; *J.E.*, 834 F. Supp. 2d at 253.

Nonetheless, parents and guardians play a significant role in the IEP process. As part of the IDEIA's procedural requirements, parents must: be informed about and consent to the evaluations of their child under the Act, 20 U.S.C. §1414(c)(3); be included as members of IEP teams, §1414(d)(1)(B); have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child," §1415(b)(1); be given written prior notice of any changes in an IEP, §1415(b)(3); and be notified in writing of the procedural

safeguards available to them under the Act. §1415(d)(1); *Schaffer*, 546 U.S. at 53. If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative "impartial due process hearing." 20 U.S.C. §1415(f). When a state is unable to provide a FAPE, it must reimburse the child's parents for the costs of attendance at a private school that is able to provide a FAPE. *D.S.*, 602 F.3d at 557.

Although state authorities have limited discretion in determining who conducts the hearings and establishing hearing procedures, Congress has legislated the "central components" of the administrative hearings, by providing minimal pleading standards, and affording all parties the right to counsel, to present evidence, and to cross-examine witnesses. *Schaffer*, 546 U.S. at 54. "Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. §1415(i)(2)(A).

In an IDEIA action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *Lebron*, 769 F. Supp. 2d at 793. District courts employ a "modified *de novo*" review of the administrative proceedings, *S.H. v. State-Operated Sch. Dist. of Newark,* 336 F.3d 260, 270 (3d Cir. 2003), where the administrative agency's factual findings are given "due weight." *Shore Reg. High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004). Under this standard, "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct," and "[i]f a reviewing court fails to adhere to them, it is obliged to explain why." *Id.* (citing *S.H.,* 336 F.3d at 271). That is, while the standard of review is not as deferential as that used to review other agency actions, courts are not free to "substitute their own notions of sound education policy for those of the educational agencies they review." *Susan*

*N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley*, 458 U.S. at 205-06). A hearing officer's conclusions of law and the legal standards applied, however, are subject to plenary review. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)); *D.S.*, 602 F.3d at 564.

Where the district court hears additional evidence, it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *S.H.*, 336 F.3d at 270 (citing *Oberti*, 995 F.2d at 1220). Where the district court does not hear additional evidence, it must find support in the record for any factual conclusions reached that is contrary to those of the hearing officer. The court must also explain why it does not accept the hearing officer's findings of fact. *Id.*; *Susan N.*, 70 F.3d at 757.

The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged. *M.R.*, 680 F.3d at 270 (citations omitted). As the Supreme Court noted in *Schaffer*, "[t]he burdens of pleading and proof with regard to most facts have been and should be assigned to the [party] who . . . seeks to change the present state of affairs." 546 U.S. at 56 (quoting 2 McCormick on Evidence §337 at 412 (7th ed.)). Under the IDEIA, it is the party "aggrieved by the findings and decision" of the hearing officer that seeks to change the present state of affairs. *See* 20 U.S.C. §1415(i)(2)(A). "Absent some reason to believe that Congress intended otherwise," the burden of persuasion falls where it usually does, on the party seeking relief. *Schaffer*, 546 U.S. at 57-58.

### *Review of the Administrative Record*

As noted, the Hearing Officer conducted a full evidentiary hearing and, thereafter, rendered a 21-page decision. The Hearing Officer's findings of fact are considered *prima facie* correct and are summarized as follows:[3, 4]

> G.K. was born on October 9, 2008, and was four years old when the due process hearing took place.[5] G.K. is identified as IDEIA eligible in the Autism disability category, with significant needs in most developmental areas: speech/language, gross and fine motor skills (physical development), social skills, and self-help skills.[6] G.K. also has sensory issues, engages in self-stimulating and self-injurious behaviors, and exhibits attention, focus, and behavior needs.[7]

> *Early Intervention Services*

> When G.K. was approximately 20 months of age, G.K. began receiving home-based EI services.[8] At Parents' request, in January 2011, G.K. began receiving home-based ABA therapy and supportive services from Lovaas through the EI provider. Parents found Lovaas' ABA therapy methods to be very effective and responsible for G.K.'s significant progress.[9]

> When G.K. turned three years old in 2011, Defendant became responsible for providing services.[10] Defendant contracts with private providers for some of the services it delivers through the EI program.[11] Prior to G.K.'s transition to IU-EI services, Parents were informed that Lovaas could not continue to provide ABA therapy and behavior support services because Lovaas was not an IU service provider and was unwilling to accept the contract terms offered by Defendant.[12]

> *First Due Process Hearing/Settlement Agreement*

> Because of delays in developing G.K.'s IEP,[13] Parents filed their first due process complaint against Defendant concerning G.K.'s past and then current educational programming and placement, and provider of ABA therapy and

---

[3] *See S.H.*, 336 F.3d at 270 ("Factual findings from the administrative proceedings are to be considered prima facie correct.").
[4] In the Hearing Officer's decision, findings of fact are set forth in enumerated paragraphs, while conclusions of law are not; thus, citations to the decision are specified as to paragraph or page number.
[5] Decision ¶1.
[6] *Id.* at ¶2.
[7] *Id.* at ¶3.
[8] *Id.* at ¶5.
[9] *Id.* at ¶6.
[10] *Id.* at ¶7.
[11] *Id.* at ¶8.
[12] *Id.* at ¶9.
[13] Compl. ¶23

8

behavior support services. A settlement was reached on April 4, 2012,[14] wherein Defendant agreed to fund G.K.'s placement in a private preschool with typical peers, for four hours a day, five days a week, with behavior support, and to provide ABA therapy delivered on a 1:1 basis at the preschool after the half-day typical preschool program ended.[15] Defendant also agreed to engage *Clarity Service Group* ("Clarity"), an entity suggested by Parents, to provide behavior services and ABA therapy, and to fund Lovaas' services during the transition period expected to be completed by June 1, 2012.

*Transition from Lovaas Institute; Clarity Service Group*
*(April 2012 – August 2012)*

Defendant found Clarity to be flexible in facilitating the transition plan with Lovaas and willing to assume additional administrative expenses for more highly trained staff than ordinarily assigned to a single case in order to ensure a successful beginning to its relationship with Defendant and Plaintiffs.[16] By agreement between Parents and the preschool staff, G.K.'s transition to the typical preschool setting was intended to be a slow process, since certain accommodations had to be provided, such as for G.K.'s significant food allergies, which required G.K. to arrive at the preschool after snack time to avoid inadvertent contact that may cause a dangerous reaction. However, because G.K. had many unplanned absences due to illness, the transition to full, five days a week participation in the preschool program went slower than expected.[17]

As the transition to Clarity commenced, Parents began expressing concerns about Clarity's fulfillment of commitments Parents believed were part of the April 4, 2012 settlement agreement, particularly with respect to data collection and staff training.[18] Defendant accepted responsibility for some early problems because it had not clearly delineated the expectations for each service provider during the transition.[19] After an early May 2012 meeting to discuss these problems, Clarity's general manager sent Parents a 16-point action plan that it would implement to address everyone's concerns. G.K.'s mother ("Mother") agreed to "back-off" from her oversight of data collection, and to not continue attempts to "micromanage" the provision of services by Clarity staff. With the action plan, Defendant believed that Parents' initial concerns had been effectively addressed.[20]

During the transition, Parents also complained of signs of regression in G.K. at home, including sleep disturbances and loss of language, which Parents

---

[14] *See* P-2.
[15] Decision ¶11.
[16] *Id.* at ¶14.
[17] *Id.* at ¶15.
[18] *Id.* at ¶16.
[19] *Id.* at ¶17.
[20] *Id.* at ¶18 (quotation marks in original).

attributed to insufficient supervision and the lack of sufficient ABA training of the *Personal Care Assistant* ("PCA") who Clarity assigned to work with G.K. Clarity told Parents that such regression was a natural reaction to the change in service providers, as the Lovaas staff familiar to G.K. became less involved and eventually transitioned from working with G.K.[21]

Parents also expressed concerns about the Clarity staff's training, supervision, methods, and procedures. These concerns included Parents' perceived anomalies in documentation of the time Clarity staff spent providing services to G.K. and data collection; concerns supported by either missing or altered daily data sheets and forms that Parents insisted on reviewing concerning ongoing assessments of Clarity staff compliance with ABA techniques.[22] In an attempt to address parents' concerns, Defendant agreed to extend the transition period an additional four weeks until the end of June 2012. Defendant, however, disagreed with Parents about the sufficiency of staff training, noting that the behavior analyst was well-trained and capable but would become anxious at Parents' numerous questions.[23]

Notwithstanding, Parents' dissatisfaction with Clarity continued. Both the IU and Clarity's staff perceived that Parents were resisting any deviation from Lovaas' methods of providing ABA therapy and behavior services. Clarity notified Defendant of its frustration at its inability to provide services satisfactory to Parents.[24] This frustration was compounded by G.K.'s frequent illnesses and sporadic attendance at preschool, which also contributed to the tension between Parents and Clarity. As an example of this frustration, Clarity noted that Mother sometimes notified Clarity that G.K. would not be attending preschool and would later change her mind only to find that G.K.'s therapist or aide had accepted another assignment and was unavailable.[25] Due to G.K.'s intermittent preschool attendance, and in light of Clarity's difficulty recruiting and retaining staff willing to accept a variable income due to inconsistent work hours, Defendant agreed to guarantee payment of a minimum number of hours each week to Clarity.[26]

After a meeting in July 2012, Parents' conviction that G.K. was not receiving appropriate services, and Mother's need to increase her oversight of Clarity's delivery of services, intensified. The week after the July meeting, Mother attended school with G.K. and took her own data. Parents retained Lovaas in early August 2012, to provide additional support and oversight of Clarity's staff, a service partially paid for with compensatory education funds from the April 4, 2012 settlement.[27] Parents also began questioning the personal

---

[21] *Id.* at ¶26.
[22] *Id.* at ¶19.
[23] *Id.* at ¶22.
[24] *Id.* at ¶23.
[25] *Id.* at ¶24.
[26] *Id.* at ¶25.
[27] *Id.* at ¶27.